FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 JUL -2 AM II: 12

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 75144-1-I |
| Respondent, | ) ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| COREY ASTANLIVIN MANN, | ) ) | |
| Appellant, | ) ) | |
| GARY BERNARD SANDERS II, | ) ) | |
| Defendant. | ) | FILED: July 2, 2018 |
| | ) | |

APPELWICK, C.J. — Mann was convicted of first degree felony murder. He argues that the trial court erred in denying his motion to sever the trial from his codefendant, in refusing to instruct the jury on the inferior offense of second degree felony murder, and in denying his motions for mistrial after references to his criminal history. He also argues that the State failed to prove first degree burglary, one of the offered alternative predicate crimes for felony murder. And, he argues that he received ineffective assistance of counsel, and that cumulative errors deprived him of a fair trial. We affirm.

## FACTS

In 2013, Tiana Wood-Sims reconnected with Latasha Walker, an acquaintance from high school, and soon they began using drugs together. Walker also sold drugs out of the apartment she shared with her boyfriend, Kenneth

McGee. Wood-Sims saw drugs and money in Walker's apartment. Wood-Sims told her cousin, Corey Mann, about the drugs and money in Walker's apartment, and they agreed to rob Walker.

On June 3, 2013, Wood-Sims spent the day with Walker away from Walker's apartment. Throughout the day, Wood-Sims stayed in contact with Mann, informing him of where she and Walker were, so that Mann could rob the apartment while they were gone. Michael Galloway testified that on that day Mann met him at a skate park and told him about the plan to rob Walker's apartment. Mann was also with Gary Sanders, whom Mann introduced to Galloway as his brother-in-law. Galloway agreed to go with Mann. Galloway drove Mann and Sanders to the apartment building for the robbery, following Mann's instructions.

At the apartment, Mann indicated for Galloway to knock on the front door. After Galloway knocked, they saw someone coming so Galloway, Sanders, and Mann returned to the car. Wood-Sims sent Mann a text message that she and Walker were back at Walker's apartment. About 10 to 15 minutes later, the three men went to the apartment door. Wood-Sims heard a knock, looked out and saw Galloway, who claimed to be a neighbor and asked if he could use a phone. Wood-Sims testified that Walker told Wood-Sims to open the door and allow him to use the phone. Galloway, Mann, and Sanders then "pushed" their way into the apartment.

Mann and Galloway went into the bedroom where Walker was located. Wood-Sims and Sanders stayed in the living room. Galloway testified that he went to the dresser where he believed the money and drugs were, and Mann began

2

wrestling with Walker. Galloway testified that as he continued to search for money and drugs, Sanders came into the bedroom, and he saw Mann and Sanders hold Walker down on the bed.[1] Galloway testified that before he left the bedroom he saw Sanders hit Walker "up to four times in her stomach." Galloway went into the second bedroom, still searching for the money and drugs, and when he returned to the first bedroom he saw Walker on the floor with a belt around her neck. Galloway testified that Sanders was sitting next to her holding one end of it.

Galloway grabbed everything he thought he could sell, and saw Sanders take some things from the living room. Before the men left, Mann told Wood-Sims that they had to make it look "legit," and then Mann hit her in the face with his open hand. After the men left, Wood-Sims went into the bedroom and saw Walker sitting on the floor with her eyes closed and head slouched. She saw a belt around Walker's neck. Wood-Sims tried to wake up Walker, poured water on her, and pushed on her chest. She heard Walker wheeze and ran outside to get help. Wood-Sims found a woman outside who then came into the apartment, called the police, and did CPR (cardiopulmonary resuscitation) on Walker.

---

[1] Sanders's testimony differed greatly from Galloway's. Sanders testified that, on June 3, 2013, Sanders asked Mann to take him to a store, but instead Mann drove him to an apartment in Kent. Sanders testified that he went into the apartment thinking that someone owed Mann money, or that Mann was going to sell someone something. Sanders testified that someone called him to the back room and when he got there he saw a woman on the floor. Sanders stated that he noticed a belt around the woman's neck. He stated that he never touched the belt. On cross-examination, Sanders admitted that he previously told Detective Brendan Wales that he agreed to help Mann get money and drugs from Walker's apartment in exchange for $2,000.

When paramedics arrived, Walker had no pulse, was not breathing, and showed a "flat line" on the cardiac monitor. Although they were able to restart her heart with medication, Walker did not survive. The medical examiner performed an autopsy and concluded that Walker bled to death internally, due to blunt force trauma to her liver.

On March 12, 2014, the State charged Galloway, Wood-Sims, Sanders, and Mann with first degree felony murder. Wood-Sims and Galloway eventually admitted their involvement, pleaded guilty to second degree murder, and testified for the State at Sanders's and Mann's joint trial. The jury found Sanders and Mann guilty as charged. The trial court sentenced Mann to 493 months of confinement. Mann appeals.

## DISCUSSION

Mann makes six arguments. First, he argues that the trial court erred in denying his motion to sever his trial from his codefendant. Second, he argues that the State failed to present sufficient evidence to prove the predicate crime of burglary. Third, he argues that the trial court erred in refusing to instruct the jury on the lesser crime of second degree felony murder. Fourth, he argues that he received ineffective assistance of counsel because counsel failed to request a cautionary jury instruction on accomplice testimony. Fifth, he argues that repeated references to his propensity for crime deprived him of a fair trial. Sixth, he argues that cumulative error deprived him of a fair trial.

4

I. Severance

Mann contends that the trial court should have granted his motion to sever his trial from Sanders. He argues that he and Sanders presented antagonistic and irreconcilable defenses. And, he claims that the massive quantity of evidence and Sanders's incriminating out-of-court statements also necessitated the trial court to sever the trials.

A defendant seeking severance must demonstrate that a joint trial would be so manifestly prejudicial as to outweigh the concern for judicial economy. State v. Sublett, 176 Wn.2d 58, 68-69, 292 P.3d 715 (2012). This court reviews a trial court's decision on a motion to sever trials for manifest abuse of discretion. Id. at 69. On appeal, the defendant must be able to point to specific prejudice. Id. The court infers specific prejudice from:

> "(1) antagonistic defenses conflicting to the point of being irreconcilable and mutually exclusive; (2) a massive and complex quantity of evidence making it almost impossible for the jury to separate evidence as it related to each defendant when determining each defendant's innocence or guilt; (3) a co-defendant's statement inculpating the moving defendant; (4) or gross disparity in the weight of the evidence against the defendants."

State v. Jones, 93 Wn. App. 166, 171-72, 968 P.2d 888 (1998) (quoting State v. Canedo-Astorga, 79 Wn. App. 518, 528, 903 P.2d 500 (1995)).

A. Irreconcilable Defenses

Mutually antagonistic defenses alone are insufficient to compel separate trials. State v. Hoffman, 116 Wn.2d 51, 74, 804 P.2d 577 (1991). Rather, it must be demonstrated that the conflict is so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both

5

are guilty. Id. For defenses to be irreconcilable, they must be mutually exclusive to the extent that one defense must be believed if the other defense is disbelieved. State v. Johnson, 147 Wn. App. 276, 285, 194 P.3d 1009 (2008). The appellate court rarely overturns a trial court's denial of a motion to sever on the basis of mutually exclusive defenses, even when one defendant tries to blame another. Id. And, the desire of one defendant to exculpate himself by inculpating a codefendant is insufficient to compel separate trials. Id. at 286.

Mann moved to sever his trial from Sanders after the State rested its case. Sanders had already moved pretrial for severance, and the court denied the motion. When Mann moved to sever after the State rested, Sanders had not presented evidence or testimony to the jury.

In his trial memo, Sanders described his defense as follows,

> At its core, Mr. Sanders' defense is three-pronged: First, he did not know of or intend to participate in a robbery or burglary. Second, he is of good, honest, law-abiding character. Third, codefendant Corey Mann is of violent, dishonest character and has a character trait of intimidating others, character traits which bear directly upon Mr. Sanders' acts and failure to act on the day of the crime and in the police interrogations which followed.

When Sanders moved to sever, counsel described his defense as follows,

> [T]he essential nature of Mr. Sanders' defense is that he would not have been where he was on the day of the crime were it not for the coercion of Mr. Mann, and it is Mr. Sanders' character that allows us or helps us argue that.
>
> . . . .
>
> . . . Offensively, we hope to show that Mr. Mann's character is one of violence, intimidation, and dishonesty.

6

Pretrial, Mann's position on Sanders's severance motion was "contingent on whether or not the Court will allow any character evidence" against Mann.

The trial court denied Sanders's motion to sever, and excluded evidence of "Mann's reputation for violence, manipulation, or untruthfulness." The trial court also ruled, "Sanders may not refer to any prior misconduct of Mann in opening statement and may not cross[-]examine any state witness about prior misconduct of Mann."

When Mann moved to sever after the State rested, the trial court stated,

> And just so that the suspense is avoided, I assure you, [Sanders's counsel] is going to probably attack [Mann]. I think their interests are in opposition. He has a different theory of the case. I think that that's evident.
>
> That in and of itself is not a reason to sever this trial. Just because they may be in opposition does not mean that this trial should be severed, and that's why this Court has denied the motions already on two occasions.

The trial court denied the severance motion.

Mann contends that he and Sanders presented irreconcilable defenses. The court's analysis on the defendant's motion to sever in Sublett is instructive. There, codefendants Sublett and Olsen were charged with premeditated first degree murder and, alternatively, felony murder. Sublett, 176 Wn.2d at 67. Sublett was convicted of both premeditated first degree murder and felony murder, while Olsen was convicted solely of felony murder. Id. Sublett's defense was a general denial of involvement in the murder. Id. at 69. He did not testify during trial. Id. Olson's defense was that he was not present for the murder, and he helped move

7

the body after the fact only because Sublett threatened him. Id. Our Supreme Court found that the trial court did not err in denying Sublett's motion to sever:

> While the two defenses are irreconcilable, they do not reach the level where the jury would unjustifiably infer from the conflict that both are guilty. The jury could have believed either or neither defendant, though it could not believe both. That is, it could have believed that Sublett did not participate at all and inferred that Olsen was lying. Or it could have believed Olsen and inferred that Sublett was lying. Given the jury's verdict, it did not believe either of them, and Sublett has not shown that this was due to the conflicting defenses rather than the evidence presented during trial. Nor did Sublett cite to any evidence admissible only as to Olsen, which prejudiced his defense. The trial court, therefore, did not err in denying severance.

Id. at 69-70 (footnote omitted) (internal citation omitted).

At the time the trial court denied the motion to sever, Sanders's stated defense was that he "did not know of or did not intend to participate in a robbery or burglary." He also claimed that "he would not have been where he was on the day of the crime were it not for the coercion of Mr. Mann." Here, as in Sublett, the jury could have believed either or neither defendant, but it could not have believed both. The jury's verdict finding both Mann and Sanders guilty demonstrates that it did not believe either defense. Mann argues that his case is distinguishable from Sublett because evidence that would not have been admissible against Mann in a separate trial was admitted in the joint trial. Mann asserts that had he and Sanders been tried separately, Sanders's out-of-court statements to Detective Wales, where he confessed that he willingly participated in the robbery in exchange for $1,000, would not have been admissible against him. And, Mann argues further that because of a defendant's Fifth Amendment right against self-incrimination,

8

Sanders could not have been compelled to testify against Mann in a separate trial, while his own trial or direct appeal were pending.

But, in State v. Emery, 174 Wn.2d 741, 753-54, 278 P.3d 653 (2012), the court held that a defendant could not show prejudice from a joint trial, in part because he offered nothing to suggest that his codefendant's testimony would not have been available and admissible against him if the trials had been severed. The Emery court relied on United States v. Throckmorton, 87 F.3d 1069, 1072 (9th Cir.1996). 174 Wn.2d at 754. In Throckmorton, the defendant argued that his codefendant would not have testified against him in a separate trial because of his right against self-incrimination. 87 F.3d at 1072. The court found no support for this argument because the codefendant declined to assert his Fifth Amendment right in the joint trial in which his own guilt was the question before the jury. Id.

Likewise, here, if Sanders had been tried separately, he could have been available to testify in Mann's separate trial. And, the record does not support Mann's argument that Sanders would not have testified against him in a separate trial, since he did not assert his right against self-incrimination in the joint trial.

Our Supreme Court "has consistently held that the mere fact that evidence admissible against one defendant would not be admissible against a codefendant if the latter were tried alone does not necessitate severance." State v. Bythrow, 114 Wn.2d 713, 721, 790 P.2d 154 (1990). And, in Washington cases where the trial court instructed the jury not to consider certain evidence of one defendant, such as a confession, against the codefendant no reversible error was found. Id. Here, the trial court instructed the jury, "A separate crime is charged against each

defendant. You must decide the case of each defendant separately. Your verdict as to one defendant should not control your verdict as to the other defendant."

Mann also argues that he suffered specific prejudice when Sanders introduced testimony from Juan Rodriguez. Rodriguez, who was in custody with Mann, testified that Mann told him "there was supposed to be money and drugs there, and that during the whole thing, he ended up slamming the girl to the ground and choking her." Rodriguez also testified that Mann described Walker as "a rich, little, white bitch." Mann argued at trial that Sanders called Rodriguez to testify to put Mann in as "bad light as possible." But, the State identified Rodriguez as a potential witness before trial. Though it did not call him to testify, it could have called Rodriguez to testify had Mann been tried separately.

Mann cannot show that the jury unjustifiably inferred his guilt from the conflict in defenses alone, because the direct and circumstantial evidence against him was strong. Wood-Sims testified that she and Mann agreed to rob Walker's apartment. Galloway also testified that, when Mann picked him up from the skate park, Mann told him that they were going to rob the apartment. Therefore, Sanders's out-of-court statement to Wales was cumulative of evidence already before the jury. Mann has not shown that the jury found him guilty due to the conflicting defenses rather than the evidence presented during trial. And, the trial court gave the appropriate instruction, directing the jury to decide each defendant's case separately, and jurors are presumed to follow their instructions. Emery, 174 Wn.2d at 754.

B. Massive and Complex Quantity of Evidence

Mann argues next that the massive and complex quantity of evidence at trial necessitated severance. Mann points to the "10 days of testimony," "complicated cell tower data," "medical and fingerprint testimony," and "[n]early 50 exhibits" as examples of the massive and complex evidence at trial.

This court will infer specific prejudice from "a massive and complex quantity of evidence making it almost impossible for the jury to separate evidence as it related to each defendant when determining each defendant's innocence or guilt." Jones, 93 Wn. App. at 171-72. With the exception of Sanders's out-of-court statement addressed above, Mann does not identify any evidence that would not have been presented had the trials been severed. Mann has not shown that the evidence was so massive or complex that it was impossible for the jury to segregate the evidence relative to each codefendant.

The trial court did not abuse its discretion in denying Mann's motion to sever.

II. Predicate Crime of Burglary

Mann argues next that the State failed to present sufficient evidence to prove the predicate crime of burglary required to support the felony murder conviction. The State presented to the jury two alternative means of committing felony murder: (1) felony murder predicated on first degree robbery; and (2) felony murder predicated on first degree burglary. Mann concedes that the State presented sufficient evidence of the predicate crime of robbery, but argues that it did not present sufficient evidence of burglary. Citing State v. Maupin, 63 Wn. App.

11

887, 822 P.2d 355 (1992), Mann contends that the remedy is reversal and remand for a new trial in which the jury is instructed only on felony murder with a predicate crime of robbery.

The Washington Constitution guarantees criminal defendants the right to a unanimous jury verdict. WASH. CONST. art. I, § 21. In alternative means cases, where the criminal offense can be committed in more than one way, an expression of jury unanimity is not required provided each alternative means presented to the jury is supported by sufficient evidence. State v. Woodlyn, 188 Wn.2d 157, 164, 392 P.3d 1062 (2017). But, when there is insufficient evidence to support one of the alternative means and the jury does not specify that it unanimously agreed on the other alternative, the conviction cannot stand. State v. Armstrong, 188 Wn.2d 333, 343-44, 394 P.3d 373 (2017).

Sufficiency of the evidence is a question of constitutional law this court reviews de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). The State bears the burden of proving the elements of a crime beyond a reasonable doubt. Id. In reviewing a sufficiency of the evidence claim, we view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found guilt beyond a reasonable doubt. State v. Witherspoon, 180 Wn.2d 875, 883, 329 P.3d 888 (2014). A challenge to the sufficiency of the evidence admits the truth of the State's evidence and all reasonable inferences that can be draw from such evidence. See id. We defer to the trier of fact on issues of witness credibility. Id.

To support the felony murder conviction based on burglary in the first degree, the State had to prove that Mann or an accomplice entered or remained unlawfully in a building with intent to commit a crime against a person or property therein, and in entering or while in the building, Mann or an accomplice assaulted any person. RCW 9A.52.020(1). A person "enters or remains unlawfully" when he or she is not then "licensed, invited, or otherwise privileged to so enter or remain." RCW 9A.52.010(2).

Mann contends insufficient evidence supports finding beyond a reasonable doubt that he or an accomplice entered or remained unlawfully in Walker's apartment, an essential element of burglary. Mann claims that neither he nor the accomplices entered or remained unlawfully in the apartment because Walker invited Wood-Sims to her apartment, allowed Wood-Sims to answer the door, and told her to let the men inside.

Only the person who resides in or otherwise has authority over the property may grant license to enter the premises. State v. Grimes, 92 Wn. App. 973, 978, 966 P.2d 394 (1998). The license to enter or remain may be limited as to time, place, or purpose, and be revoked. State v. Lambert, 199 Wn. App. 51, 73, 395 P.3d 1080 (2017), review denied, 189 Wn.2d 1017, 404 P.3d 499 (2017), cert. denied, 138 S. Ct. 1571 (2018); see State v. Collins, 110 Wn.2d 253, 261, 751 P.2d 837 (1988). The trier of fact may infer "a limitation on or revocation of the privilege to be on the premises" from the circumstances of the case. Collins, 110 Wn.2d at 261.

In Collins, the victims let the defendant, a stranger, into their home to use the telephone and the defendant raped the victims. Id. at 254-55. The court concluded the license to enter was limited to a specific area and purpose, to use the telephone. Id. at 261. When the defendant exceeded the limitation to place and purpose, his license to remain was implicitly revoked. Id.

Here, there is evidence that Walker told Wood-Sims to answer the door to Galloway. After there was a knock on Walker's apartment door, Wood-Sims testified,

> I only seen [sic] one person, and that was Galloway, and he asked if he could use the phone, because something happened with his car; he was her neighbor.
>
> And then Tasha was in the room, because she thought that it was Tyrrell[ Walker]. And we had cocaine out, and Tyrrell didn't know that she was doing drugs; so she kind of panicked. So she said, go get the door, and she shut the bedroom door.
>
> And then I asked her, can I open the door? I told her that it was her neighbor, and she said, go ahead, let them use the phone.

Wood-Sims testified that she did not recognize Galloway at the time and did not know that he was part of Mann's group. But, she also testified that when Galloway knocked on the door she knew that the men "were going to take Tasha's money and her pills." And, Wood-Sims testified that she lied to Walker when she told her that somebody was there to use the phone, to accomplish the plan of robbing Walker. Further, Sanders testified on cross-examination that when he and the other men went to Walker's door, he heard a woman on the other side of the door say "don't let them in." Viewed in the light most favorable to the State, this is sufficient evidence to establish unlawful entry.

14

Moreover, under <u>Collins</u>, the trier of fact could infer that Galloway and his accomplices had an invitation or license only to a specific area of the home and for the single purpose, to use the phone. As in <u>Collins</u>, Walker purportedly permitted Wood-Sims to let Galloway in for that specific purpose. Once Galloway and the other men went into the other rooms of Walker's apartment and held Walker down as they looked for drugs and money, any privilege Galloway and the other men had up to that time was revoked. <u>See</u> <u>Collins</u>, 110 Wn.2d at 261.

We find that the evidence was sufficient for the jury to determine that Mann and his accomplices both entered and remained unlawfully in Walker's apartment on June 3, 2013. Thus, the State presented sufficient evidence to prove the predicate crime of burglary required to support the first degree felony murder conviction.

## III.   Inferior Degree Jury Instruction

Next, Mann argues that the trial court erroneously refused to instruct the jury on the inferior crime of second degree felony murder.

> A crime is an inferior degree of another when
>
> (1) the statutes for both the charged offense and the proposed inferior degree offense "proscribe but one offense"; (2) the information charges an offense that is divided into degrees, and the proposed offense is an inferior degree of the charged offense; and (3) there is evidence that the defendant committed only the inferior offense.

<u>State v. Peterson</u>, 133 Wn.2d 885, 891, 948 P.2d 381 (1997) (quoting <u>State v. Foster</u>, 91 Wn.2d 466, 472, 589 P.2d 789 (1979 and <u>State v. Daniels</u>, 56 Wn. App. 646, 651, 784 P.2d 579 (1990)).

This court reviews a trial court's decision to give a jury instruction de novo if based upon a matter of law, or for abuse of discretion if based upon a matter of fact. Taylor v. Intuitive Surgical, Inc., 187 Wn.2d 743, 767, 389 P.3d 517 (2017). Thus, where the parties' disagreement about an instruction is based on a factual dispute, it is reviewed for an abuse of discretion. Id. To determine whether to give an instruction, the trial judge must merely decide whether the record contains the kind of facts to which the doctrine applies. Id.

Mann requested the court to instruct the jury on second degree felony murder predicated on either second degree theft or assault. The trial court declined to give the inferior offense instruction based on the test established in State v. Workman, 90 Wn.2d 443, 584 P.2d 382 (1978). Mann asserts the trial court should have used the test in Peterson instead and should have found he satisfied that test for the instruction. Our Supreme Court has pointed out that the Workman test to determine if a crime is a lesser included offense differs from the test to determine if a defendant is entitled to an inferior degree offense instruction. State v. Tamalini, 134 Wn.2d 725, 732, 953 P.2d 450 (1998). The difference is in the legal prongs of the tests. Compare Workman, 90 Wn.2d at 447-48 with Peterson, 133 Wn.2d at 891. The difference is immaterial in this case, though, because both the Workman test for lesser degree instruction and the Peterson test for an inferior degree offense instruction require the same factual prong: that the evidence in the case supports that only the lesser or inferior degree offense was

committed.[2] See State v. Condon, 182 Wn.2d 307, 316, 343 P.3d 357 (2015); Peterson, 133 Wn.2d at 891.

Here, the evidence at trial does not support that Mann committed only second degree felony murder predicated on second degree theft. Wood-Sims testified that Walker purportedly permitted Wood-Sims to let Galloway in so that he could use a phone. Once Galloway, Mann, and Sanders went into the other rooms of Walker's apartment and held Walker down as they looked for drugs and money, any privilege Galloway and the other men had up to that time was revoked. See Collins, 110 Wn.2d at 261. As concluded above, there was sufficient evidence that Mann or his accomplices entered or remained unlawfully in Walker's apartment, a required element for burglary. There was also ample evidence that the men took property from Walker's apartment. Therefore, the evidence does not support that Mann and his accomplices committed only the lesser offense of theft. The trial court reasonably determined that there was no factual support for an instruction on second degree felony murder based on theft.

After the State responded to Mann's request for a second degree felony murder instruction predicated on theft, Mann amended the instruction request to include the predicate felony of assault. Under RCW 9A.32.050(1)(b), a person commits second degree felony murder if he causes a person's death in the course of committing a felony not enumerated under the statute for first degree felony murder. The felonies under first degree murder include robbery in the first or

---

[2] Because Mann's requested instruction fails the factual prong of either test, we need not reach the parties arguments over whether Mann satisfied the legal prong of the Peterson test.

second degree and burglary in the first degree. RCW 9A.32.030(c). Since there was substantial evidence that Mann and his accomplices committed robbery or burglary, the trial court did not err in finding that there was also not a factual basis for <u>only</u> the inferior offense of second degree felony murder based on assault.

Therefore, the trial court did not abuse its discretion in declining to instruct the jury on the inferior offense of second degree felony murder based on theft or assault.

## IV.   Ineffective Assistance of Counsel

Mann argues that he was denied effective assistance of counsel because his counsel failed to request a cautionary instruction on accomplice testimony.

The Sixth Amendment right to counsel includes the right to effective assistance of counsel. <u>Strickland v. Washington</u>, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed.2d 674 (1984). In order to prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate (1) deficient performance, that his attorney's representation fell below the standard of reasonableness, and (2) resulting prejudice, that but for the deficient performance, the result would have been different. <u>State v. Hassan</u>, 151 Wn. App. 209, 216-17, 211 P.3d 441 (2009). If a defendant fails to establish either prong, we need not inquire further. <u>Id.</u> at 217.

To establish deficient performance, the defendant has the heavy burden of showing that his attorney made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. <u>Id.</u> This court approaches an ineffective assistance of counsel argument with a strong

presumption that counsel's representation was effective. State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). The defendant has the burden to show that based on the record, there are no legitimate strategic or tactical reasons for the challenged conduct. Hassan, 151 Wn. App. at 217. And, to establish ineffective assistance based on counsel's failure to request a jury instruction, the defendant must show that he was entitled to the instruction. State v. Olson, 182 Wn. App. 362, 373, 329 P.3d 121 (2014).

It is always the better practice for a trial court to give the cautionary instruction whenever accomplice testimony is introduced. State v. Harris, 102 Wn.2d 148, 155, 685 P.2d 584 (1984), overruled on other grounds by State v. McKinsey, 116 Wn.2d 911, 914, 810 P.2d 907 (1991). A trial court's failure to give this instruction is reversible error where the State relies solely on accomplice testimony. Id. But, it is not reversible error "[i]f the accomplice testimony was substantially corroborated by testimonial, documentary or circumstantial evidence." Id. Evidence sufficiently corroborates accomplice testimony if it fairly tends to connect the accused with the commission of the crime charged. State v. Calhoun, 13 Wn. App. 644, 648, 536 P.2d 668 (1975). It is not necessary that the accomplice be corroborated in every part of his testimony. Id.

The State presented an abundance of accomplice testimony at Mann's trial. Mann, Sanders, Galloway, and Wood-Sims were all charged with first degree murder in the same charging document. Galloway and Wood-Sims ultimately pleaded guilty to second degree murder and testified for the State against Mann and Sanders.

But, the State presented other evidence that corroborated their testimony, such as cell phone records, cell tower records showing phone movement, medical testimony, fingerprint data, and an autopsy report. The State presented evidence that Galloway's fingerprints were found inside Walker's apartment. The State used cell phone records to show that the cell phone Mann was using sent a signal to the cell tower close to Walker's apartment in the hour before Walker was killed. Detective Wales further corroborated testimony from Wood-Sims and Galloway. Wales testified that he realized from Mann's phone records that Wood-Sims and Mann had communicated extensively, and this led him to confront Wood-Sims with the phone records. McGee testified about the items missing from his and Walker's apartment after the robbery. The State also presented evidence that Jessica Ozuna Mann, Mann's wife, pawned a gold watch stolen from McGee and Walker's apartment.

This is not an exhaustive summary of the corroborating evidence in this case, but it shows that the State sufficiently corroborated the accomplice testimony to fairly connect Mann with the commission of the crime charged. Thus, the trial court's failure to instruct the jury on accomplice testimony is not reversible error, and Mann was not prejudiced by his counsel's failure to request the instruction. Mann has not shown that he received ineffective assistance of counsel.

## V. References to Mann's Criminal History and Motions for Mistrial

Next, Mann contends that the trial court abused its discretion when it denied his motion(s) for mistrial after repeated references to his criminal history in violation of pretrial rulings. .

Following the trial court's pretrial motions, the State instructed its witnesses not to talk about Mann's character or that Mann had ever been in jail or prison. But, Kamela Wood, Wood-Sims mother, mentioned in her testimony that Mann had been "locked up" and at one point that he had gotten "out of prison." During Sanders's cross-examination he testified, about Mann, "And I know he wasn't just going to just let me jump out [of] the car and walk away. He would probably come look for me, and gun me down or something. So, with that type of individual, that's what I felt like." The trial court promptly instructed the jury to disregard both Wood's and Sanders's improper statements.

Mann moved for a mistrial after the State's opening statements in which counsel stated that Mann had been jailed, and again moved for a mistrial after Wood's reference to Mann's time in prison. The court denied both motions. The court gave the defense-proposed limiting instruction, "You heard evidence that defendant Corey Mann was in custody in 2013. You are not to consider the fact that the defendant Corey Mann was in custody as evidence of guilty in this matter." Mann argues that the cumulative effect of repeated references to his propensity for crime deprived him of a fair trial.

A trial court's denial of a motion for a mistrial is reviewed for abuse of discretion. State v. Gamble, 168 Wn.2d 161, 177, 225 P.3d 973 (2010). A denial of a motion for mistrial should be overturned only when there is a substantial likelihood that the prejudice affected the verdict. Id. Thus, when a trial irregularity occurs, the court must decide its prejudicial effect. Id. In determining the effect of an irregularity, the court examines (1) its seriousness; (2) whether it involved

cumulative evidence; and (3) whether the trial court properly instructed the jury to disregard it. Id. A trial court has wide discretion to cure trial irregularities resulting from improper witness statements. Id. In the context of a given case it may be that improper evidence did not affect the outcome of the trial, and in such situations a trial court may deny a motion for a mistrial. Id. Although violations of pretrial orders are generally viewed as serious irregularities, the seriousness is diminished where the improper testimony is not intentionally elicited and is not provided by "professional" witnesses like law enforcement officers. See id. at 178.

Here, the witnesses were not professionals, and their remarks were not responsive to the prosecutor's questions. While the remarks at issue violated the trial court's pretrial order, the jury was instructed to disregard both statements. Given the curative instructions, and in the context of the trial as a whole and all the evidence, we conclude that the trial court did not abuse its discretion in denying Mann's motions for mistrial.

VI.   Cumulative Error

Finally, Mann argues that the cumulative effect of errors at his trial deprived him of a fair trial and that this court should reverse and remand.

The cumulative error doctrine allows an appellate court to reverse a conviction based on the combined effect of a number of errors, even if each error was individually harmless. State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). "The doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial." Id.

22

We found above that either the errors did not occur, or that Mann has not demonstrated prejudice from any of the errors he alleges. Therefore, we reject Mann's cumulative error claim.

We affirm.

WE CONCUR: